# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| JENNIFER WILLIAMS, | : | Case No. 3:16-cv-00324 |
| Plaintiff, | : | District Judge Thomas M. Rose |
| | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| NANCY A. BERRYHILL, Commissioner of the Social Security Administration, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

Plaintiff Jennifer Williams brings this case seeking review of the Social Security Administration's denial of her applications for Disability Insurance Benefits and Supplemental Security Income. The Administration denied Plaintiff's applications through Administrative Law Judge (ALJ) Gregory G. Kenyon's decision in which he concluded that Plaintiff was not under a benefits-qualifying disability. This case is presently before the Court for review of ALJ Kenyon's decision by way of Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. #11), and the administrative record (Doc. #6).

Plaintiff asserted before the Administration that she had been under a disability

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

beginning on January 6, 2011.  She was then in her mid-thirties and was thus considered a "younger" person under social security law.  She has a high-school (GED) education and has worked as a cashier, a general manager, and a retail manager.  Her employment was continuous and steady from 1994 to 2011.  (Doc. #6, *PageID* #s 107-108, 392).  She is married with 2 children.

Plaintiff has, over the years, experienced, many health problems: hypothyroidism due to Hashimoto's disease (an autoimmune disease), diabetes, heart palpitations, celiac disease, kidney disease, depression, and anxiety disorder.  She testified during a first administrate hearing that she stopped working in January 2011 due to depression/anxiety, "terrible mood swings…," celiac disease, and tachycardia that caused her heart palpitations.  (Doc. #6, *PageID* #127).  Depression caused her to sleep a lot and avoid being around people.  *Id*. at 129.  Celiac disease caused her extreme fatigue, malnutrition, and "a lot of intestinal issues."  *Id*.  at 127.

She has had thyroid problems since age 19 and those problems developed into Hashimoto's disease.  She took prescription medications—Synthroid, Metoprolol, Seroquel, and Zoloft, and a medication for diabetes.  And, she had difficulty controlling her blood glucose levels due to diabetes.

Plaintiff testified that she can walk about ½ block on a flat surface without resting.  Fatigue would prevent her from walking further without sitting down first.  She cannot sit still for long because her legs will fall asleep and she starts shaking.  If she moved around while sitting, she could sit for about 15-20 minutes.  The most she could lift was 10 pounds.

2

During a second administrative hearing in June 2015, Plaintiff informed ALJ Kenyon that her medications made her drowsy and prevented her from driving. She had also experienced vertigo for 2½ months before ALJ Kenyon's hearing, and her doctors told her not to drive. Plaintiff noted that when she takes her medications, she is "not as sharp." *Id*. at 94. She also said that she takes up to 17 pills a day, and she observed, "[there is] nothing that's more depressing than that." *Id*. at 110.

Plaintiff also experienced daily heart palpitations, although they were not as "hard" due to her medications. *Id*. at 95. The heart palpitations sometimes last a few seconds or a minute or 5 minutes. She described them as feeling like "someone is on the inside of your chest punching out." *Id*. She did not have chest pain or other cardiac symptoms but did have longstanding high cholesterol. She took medication for high cholesterol but her cholesterol levels fluctuated, as did her thyroid levels.

According to Plaintiff, her very low thyroid levels caused everything else in her body to work overtime, such as her liver, spleen, intestines, and kidneys. *Id*. at 100. She lost her gallbladder and teeth due to her low thyroid levels. *Id*. at 100, 108. The record confirms that her gallbladder has been removed. *Id*. at 855. Plaintiff also had kidney stones that caused significant damage to her right kidney, requiring placement of a stent. She explained that problems with the stent continually left her blood in her urine "from the tube." *Id*. at 101.

Plaintiff's celiac disease is, in general, an autoimmune disease in which eating foods containing gluten damages the small intestines and causes malabsorption. The Merck Manual, Merck Research Laboratories, pp. 299-300 (17th ed. 1999);

3

https://celiac.org (search, Celiac Disease; "What is Celiac Disease?"). Plaintiff testified that she was on a gluten free diet, which helped, but if she misread a food label and ate something containing gluten, her stomach would swell a lot and cause her nausea and diarrhea.

Plaintiff's history of mental health difficulties included a hospitalization at one point because she had suicidal thoughts. *Id*. at 101. At the time of ALJ Kenyon's hearing, she experienced daily suicidal thoughts. She was also experiencing a lot of panic attacks (almost every other day). She testified that when she had a panic attack, "[i]t's fear/panic and I can't breathe. I can't catch my breath good." *Id*. at 102. She will also experience rapid heartbeat and would have difficulty calming herself. She has difficulty leaving home and being around strangers. On three occasions, she had attempted to go to her brother's residence for her nieces' birthday parties but could only stay for ten minutes before needing to leave. *Id*. at 104. She does not socialize with friends, except for her husband and mother (who lives with them). *Id*. at 105.

Plaintiff reported that her ability to concentrate was "very slim" and would require her to repeatedly read the same things over. *Id*. at 103. She attributes this to her medications, which made her "feel like a zombie." *Id*. She testified that during a typical day, "I wake up, generally make a cup of coffee, sit on the couch. I occasionally turn the TV on. I do have a computer I occasionally read things on, but usually I'm up 45 minutes. After I take all my medications and everything I usually am asleep again." *Id*. at 106.

Plaintiff estimated that she could lift five to ten pounds, stand in one spot for a minute or two, and walk for five minutes before she "would probably fall asleep." *Id*. at 105. She did not think she could work a full-time job because during a normal week, she might have two good days and five bad days. And, she noted, "I never know what days I could have that were good." *Id*. at 106. During a good day, she does not nap:

> A good day, if I'm not fatigued and sleeping I'm maybe sitting on the front porch. I'll have my grandson come over. He's four. I sit with him and watch him play outside and not sleep. That's a good day is to not take naps.

*Id*. at 107. On a bad day, she takes naps in bed all day. Her fatigue stemmed in part from depression. *Id*. at 108-09. She did not get along with other people very well. She mentioned one incident in a grocery store when she got into a "pretty ugly" screaming match with a lady who tried to cut in front of her in line. *Id*. As a result of this incident, her psychiatrist said that she should not interact with the public. *Id*.

Plaintiff contends that the ALJ failed to properly evaluate certain medical sources' opinions—namely, those of physicians Dr. Amita Oza, Dr. Charles Metcalf; psychologist Dr. Mary Ann Jones, psychiatrist Dr. Peter Ramirez, and counselor Ms. Margaret Baker, MSW.

Dr. Oza examined Plaintiff on one occasion (in October 2012) at the request of the state agency. Dr. Oza reported:

> Ms. Williams is [a] 36 year old obese female patient, who has a history of hypothyroidism, celiac disease, and depression. Based on my examination today, her hypothyroid symptoms have gotten worse because of lack of absorption due to her celiac disease. She also is depressed, which may be partly related to her hypothyroidism. Her

5

>medical conditions need to be treated and then she should be able to work.

(Doc. #6, *PageID* #579).

Dr. Metcalf testified during ALJ Kenyon's hearing about his review of Plaintiff's medical records (up to and including Exhibit 29F). Dr. Metcalf is board certified in internal medicine. He believed that Plaintiff's primary limiting condition "would probably be her cardiac condition." *Id*. at 85. He explained, "She has a tendency to develop supraventricular tachycardia or … the record sometimes refers to it as … atrial tachycardia and when that happens she feels palpitations. She is aware of it." *Id*. Dr. Metcalf observed that she is being treated for this with medication, and her cardiologist is giving her a clean bill of health.

Dr. Metcalf found few records related to Plaintiff's diabetes, and he reported that she has not had complications from diabetes. He characterized Plaintiff's celiac disease as "mild." *Id*. at 86. Dr. Metcalf opined that Plaintiff's kidney problems caused her no physical limitations. Dr. Metcalf then reported that Plaintiff has mild obesity with a Body Mass Index between 32 and 43. *Id*. at 86-87. In Dr. Metcalf's view, Plaintiff's obesity was significant enough to take into consideration when assessing Plaintiff's work abilities and limits. *Id*.

The last problem Dr. Metcalf discussed was Plaintiff's low thyroid (TSH) levels. He noted that she has reportedly had this problem since age 19. He found, "[t]here's not much in the record that indicates they have a problem with it." *Id*. at 87. He further testified:

> She has been concerned that sometimes she not getting enough [sic]. There are a couple of records and one in 2012 and one in 2013 where she was clearly getting too much thyroid and for a person having cardiac arrhythmias occasional[ly], that's something really to be concerned about. But most of the time her TSH tests, <u>which are the gold standard test, were within normal limitation</u>. And, again, we have no physical limitation from the thyroid.
>
> The result of this is that I don't have any significant medical condition that significantly affects her functional capacity. These are all conditions that require following by her physician and they all have potential problems with them, but none of them are to the extent where they are producing physical limitation.

*Id*. (emphasis added). He elaborated that Plaintiff could perform light work as long as she avoided ladders, scaffolding, unprotected heights, dangerous machinery, and prolonged exposure to heat or cold. *Id*.

Focusing on Plaintiff's mental impairments, psychologist Dr. Jones examined Plaintiff once. She diagnosed Plaintiff with psychological factors affecting physical condition and with dysthymic disorder. She rated Plaintiff's global assessment of functioning at 51. *Id*. at 561.

Psychologist Dr. Donald Kramer evaluated Plaintiff at the request of the state agency. He diagnosed Plaintiff with mood disorder (not otherwise specified) and anxiety disorder (not otherwise specified). He rated Plaintiff's global assessment of functioning at 60. *Id*. at 589.

Psychiatrist Dr. Ramirez, who had treated Plaintiff for five months before providing his opinion, observed that she had a depressed mood, blunted affect, and mild anxiety symptoms. *Id*. at 698. He believed that Plaintiff's ability to understand, remember, understand, and follow directions was fair; her ability to maintain long-term

7

attention was poor; her ability to sustain concentration, persist at tasks, and complete them in a timely fashion, was poor due to her impaired stress tolerance; and her ability to engage in social interaction was good, but her adaptation was poor. *Id*. at 699. Dr. Ramirez also indicated that due to her poor stress tolerance, normal job stressors would result in exacerbation of her mood stability. In the end, Dr. Ramirez concluded that Plaintiff would be unable to tolerate normal job stress and would be unreliable in attendance due to her anxiety and mood instability. *Id.* at 701.

Plaintiff's mental health counselor Margaret Baker, MSW reported on June 27, 2013:

> I am currently seeing Ms. Jennifer Williams … for therapy. She has been a client here [Daymont Behavioral Health Care, Inc.] since 3-15-13. Ms. Williams has some mental health symptoms that interfere with her being able to functional adequately on any given day. She is working on healthy coping skills and is doing well in her therapy. At this time she could not safely work or deal with the public….

*Id*. at 696.

Turning to ALJ Kenyon's decision, he concluded Plaintiff was not under a disability by conducting the five-step evaluation required by social security law. *See* 20 C.F.R. § 404.1520(a)(4). His more significant findings began with his conclusion that Plaintiff had the severe impairments of "hypothyroidism, secondary to Hashimoto's disease; diabetes mellitus; a history of celiac disease; a history of kidney disease; and a history of cardiac arrhythmia; depression; a bipolar disorder, and an anxiety disorder—

8

but her impairments did not automatically constitute a disability.[2]  (Doc. #6, *PageID* #s 62-65).

Next, ALJ Kenyon assessed Plaintiff's residual functional capacity or the most she could do despite her impairments.  *See* 20 C.F.R. § 404.1545(a); *see also Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).  Doing so, the ALJ found that despite Plaintiff's impairments, she could still perform light work with many limitations, including, for example, standing and walking four hours a day; no crawling or climbing of ladders, ropes, or scaffolds; no work arounds hazards; no work in the food-service industry; no public contact; and no fast-paced production work or jobs involving strict production quotas.  (Doc. #6, *PageID* #65).  ALJ Kenyon concluded that Plaintiff could no longer perform the jobs she had done in the past due to these limitations.

The ALJ further determined that, given Plaintiff's residual functional capacity, high-school education, work experience, and age, she could still perform a significant number of jobs available to her in the national economy.  The availability of such jobs (routing clerk, labeler, mail clerk) meant that Plaintiff was not under a benefits-qualifying disability.  *Id*. at 70.

The present judicial review of ALJ Kenyon's decision determines whether he applied the correct legal standards and whether substantial evidence supports his findings.  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r

---

[2]  A social security applicant that meets or equals the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, is automatically under a disability.  *See* 20 C.F.R. §404.920(a)(iii); *see also Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).

9

*of Soc. Sec*., 478 F.3d 742, 745-46 (6th Cir. 2007). If he failed to apply the correct legal criteria, his decision may be fatally flawed even if the record contains substantial evidence supporting his findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004). A conclusion is supported by substantial evidence when "a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance ...." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Plaintiff contends that the ALJ erred in his evaluation of Dr. Ramirez's opinions by failing to adequately confront or consider Dr. Ramirez's findings. Plaintiff further contends that the ALJ erroneously determined—in a conclusory fashion—that Dr. Ramirez's findings were fully accommodated in his (the ALJ's) assessment of Plaintiff's mental work limitations.

Social Security regulations recognize several different categories of medical sources: treating physicians, nontreating yet examining physicians, and nontreating yet record-reviewing physicians. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013). "When determining how much weight to assign the opinion of a non-treating source…, 'the ALJ should consider factors including the length and nature of the treatment relationship, the evidence that the physician offered in support of her opinion, how consistent the opinion is with the record as a whole, and whether the physician was

10

practicing in her specialty.' Unless an ALJ assigns controlling weight to a treating physician's [or psychologist's] opinion, the ALJ must consider 'all' of the above factors 'in deciding the weight [the ALJ] give [s] to any medical opinion.'" *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 836-37 (6th Cir. 2016) (quoting, in part, 20 C.F.R. § 404.1527(c), § 404.1527(e)(2)(ii)); *see Stacey v. Comm'r of Soc. Sec.*, 451 Fed. App'x 517, 519 (6th Cir. 2011) (quoting, in part, 20 C.F.R. § 404.1527(d)). ALJs "must say enough 'to allow the appellate court to trace the path of his reasoning.'" *Stacey*, 451 Fed. App'x at 519 (quoting, in part, *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995)).

The ALJ stated that he placed "moderate weight" on Dr. Ramirez's opinions, explaining, "Dr. Ramirez … noted that the claimant had some deficits in stress tolerance and attention/concentration but these have been fully accommodated by the above mental restrictions." (Doc. #6, *PageID* #66). This, however, is problematic at best. The ALJ's reference to the "above mental restrictions" pointed to the restrictions he identified in his assessment of Plaintiff's mental residual functional capacity. Yet, those restrictions did not account for Dr. Ramirez's opinion that Plaintiff "would be unreliable in attendance due to anxiety and mood instability." *Id*. at 701. In fact, the ALJ did not mention in his decision Dr. Ramirez's opinion about Plaintiff's inability to be reliable in attendance due to anxiety and mood instability. This was error. *See Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) ("ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."); *see also Minor v. Comm'r of Soc. Sec.*, 513 Fed Appx. 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis). And, because the ALJ did

11

not mention this aspect of Dr. Ramirez's opinion, the ALJ did not connect his reasoning in a meaningful way to Dr. Ramirez's opinion about Plaintiff's unreliability in work attendance. *See* Doc. #6, *PageID* #66. It is therefore far from clear that the ALJ considered Dr. Ramirez's opinion about Plaintiff's mood instability causing her to be unreliable in work attendance or weighed this opinion under the factors required by the regulations.

It is true, as Defendant points out, that the ALJ relied on certain findings in Dr. Ramirez's report for placing moderate weight on his opinions. But, the ALJ's findings are not logically connected to Dr. Ramirez's opinion that Plaintiff's mood instability would cause her to be unreliable in work attendance. The ALJ observed that Dr. Ramirez's findings "are actually rather benign and include normal conversation and speech, only mild anxiety" and that Dr. Ramirez found Plaintiff to have "good insight and judgment." *Id*. What the ALJ misses is the significance of Dr. Ramirez finding that Plaintiff's mood was unstable. This instability, by definition, would involve fluctuations in Plaintiff's anxiety level and symptoms along with her depression and related symptoms. Similarly, Plaintiff's good judgment and insight, and her ability to engage in normal conversation and speech could well be present during less symptomatic times and lacking or even absent during more symptomatic times.

Another reason the ALJ provided for placing only moderate weight on Dr. Ramirez's opinion was that her "alleged hallucinations were noted to have ameliorated with treatment…." *Id*. But, the fact that Plaintiff's hallucinations decreased with treatment did not necessarily correspond to a resulting decrease in, or elimination of, her

mood instability.  Dr. Ramirez, moreover, was well aware that Plaintiff's hallucinations had decreased when he opined that Plaintiff's mood instability would cause her to be unreliable in work attendance.  The ALJ's lay opinion (he did not rely on a medical-source opinion) about the significance of Plaintiff's decreased hallucinations simply substituted for Dr. Ramirez's professional assessment of Plaintiff's mood instability.  This constituted error because "an ALJ must not substitute his own judgment for a physician's opinion without relying on other evidence or authority in the record." *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000); *see also Meece v. Barnhart,* 192 Fed. App'x 456, 465 (6th Cir.2006) ("the ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence").

Plaintiff also argues that the ALJ erred by placing more weight on Dr. Kramer's estimate of Plaintiff's global assessment of functioning at 60 that he placed on Dr. Jones's estimate of Plaintiff's global assessment of functioning at 51.

The ALJ placed great weight on Dr. Kramer's opinions by finding that her assessment of Plaintiff's global assessment of functioning at 60 "seems more in line with [Plaintiff's] level of daily activity…." (Doc. #6, *PageID* #66).  Similarly, the ALJ found Dr. Jones's estimate of Plaintiff's global assessment of functioning at 51 to seem "unreasonably low in view of the claimant's day to day functioning." *Id*.  Substantial evidence does not support these conclusory findings.  The ALJ failed to cite evidence showing that Plaintiff engaged in a significant or high level of daily activity.  Elsewhere in his decision, when discounting Plaintiff's credibility, the ALJ concluded that

Plaintiff's impairments do not significantly restrict her daily activities. *Id*. at 68. In support of this, the ALJ found that Plaintiff is able to care for her two children, and her self-reported sedentary lifestyle is a matter of her personal choice rather than a result of a severe impairment. *Id*. Again, however, the ALJ failed to cite evidence supporting these findings. This is a flaw because without such evidence the record appears to lack substantial, or any, evidence supporting the ALJ's conclusion that Plaintiff is able to care for her two children (it seems her Mother cares for them, *see, e.g.*, *PageID* #s 98-99, 560), and it is not clear what daily activities the ALJ believed Plaintiff actually did that conflicted with her self-reported sedentary lifestyle. Because the ALJ relied on his unsupported conclusion about Plaintiff's daily activities, his decision to credit Dr. Kramer's estimate of Plaintiff's global assessment of functioning, over Dr. Jones's estimate, lacks substantial evidentiary support.

The ALJ's unsupported conclusion about Plaintiff's daily activities likewise infected his decision to discount Plaintiff's credibility. *Id*. at 69. Although an ALJ's credibility determinations are generally "accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility…," *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997), substantial evidence must support the ALJ credibility findings, *id*. Without substantial evidence supporting the ALJ's conclusion about Plaintiff's daily activities, her daily activities were not a valid reason to discount her credibility. Additionally, at least some of the ALJ's findings concerning Plaintiff's credibility were incorrect. For example, the ALJ noted, "There is no evidence that she required hospitalization for psychiatric

complaints." (Doc. #6, *PageID* #68). The record shows the opposite: Plaintiff was hospitalized in an inpatient psychiatric unit for several days in late February 2013. *Id*. at 602-42. The ALJ also discounted Plaintiff's credibility because "she did not seek any mental health treatment until well after the alleged onset date." *Id*. at 68. In so finding, the ALJ did not indicate he considered any possible explanations for this. Without such consideration, her delay in seeking mental health treatment is not a valid reason to discount her credibility. *See* Soc. Sec. R. 96-7p, 1996 WL 374186, *7 (July 2, 1996) ("an adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.").[3]

In light of the above, Plaintiff's requested remedy comes into focus. She seeks either a judicial award of benefits or, at a minimum, an order remanding this matter for further administrative proceedings.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award

---

[3] A new credibility Ruling, which applies to ALJ's decision dated on or after March 16, 2016, did not eliminate the need for ALJs to consider possible reasons an applicant may have for not seeking or complying with treatment. *See* Soc. Sec. R. 16-3p, 2106 WL 1119029, *8 (March 16, 2016).

15

of benefits.  *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994).  The latter is warranted "only where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking."  *Felisky*, 35 F.3d at 1041 (quoting *Faucher v. Sec'y of Health & Humans Servs.*, 17 F.3d 171, 176 (6th Cir. 1994)).

A remand for an award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and because the evidence of disability is not strong while contrary evidence is weak.  *See Faucher*, 17 F.3d at 176.  Yet, Plaintiff is entitled to an Order remanding this matter to the Social Security Administration pursuant to sentence four of § 405(g) due to problems set forth above.  On remand the ALJ should be directed to review the evidence of record and determine anew whether Plaintiff was under a benefits-qualifying disability pursuant to the applicable five-step sequential evaluation procedure.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Jennifer Williams was under a "disability" within the meaning of the Social Security Act;

3. This case be remanded to the Commissioner and the Administrative Law Judge under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report; and

4. The case be terminated on the docket of this Court.

July 31, 2017                                              *s/Sharon L. Ovington*
                                                           Sharon L. Ovington
                                                           United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).